## The Exchange Bank vs. Monteath and others.

J. & M. being the general agents, at Albany, of the Albany and Canal Line of Tow Boats, J. made three drafts upon H., the agent of the line in New-York, at the request and *for the accommodation* of the Canal Bank, which were respectively signed "J. & M., ag'ts A. and Canal Line of Tow Boats," and were payable to their own order, and addressed to and accepted by H. as "agent," and indorsed by J. in the name of "J. &. M., agents." These drafts were subsequently discounted by the plaintiff, for a valuable consideration. In an action against the Tow Boat Company, upon these drafts, it was admitted that J. & M. were authorized to transact the business of the company and, for that purpose, were authorized to draw, indorse and accept such checks, drafts and bills of exchange as were necessary for carrying on such business, and that H. had the like authority in respect to the business in New-York. *Held*, that the authority of J. to make and indorse the drafts was sufficient; but that he transcended his authority in applying the drafts to a purpose not within his agency; and that the delivery thereof to the cashier of the Canal Bank, to be used for the benefit of that bank and not for the benefit of his principals, was an unauthorized act.

*Held also*, that the case should have been submitted to the jury with instructions that the plaintiff would be entitled to recover if J. was the general agent of the defendants, and, as such, was authorized to make and indorse notes and bills of exchange for the benefit of his principals, and the drafts so made and indorsed were received and discounted by the plaintiff in the ordinary course of business. WRIGHT, J., dissented.

*Held further*, that the drafts having been made and put into circulation in violation of the duty of the agent, the defendants had a right to know how the plaintiff obtained them; but that if it appeared that the plaintiff was not chargeable with knowledge of the circumstances under which the paper was made and delivered to the Canal Bank, but it was received in the ordinary course of the plaintiff's business, in the belief that it was made for a legitimate purpose, the plaintiff ought not to bear the loss.

As between two innocent parties, thus situated, the principals, in whose name the drafts were made, rather than the holder of the drafts, should suffer for their misplaced confidence.

The law will infer authority in an agent, as well from the general character of the acts which he has been permitted to perform, as from a special written power.

THE plaintiff was a banking corporation doing business at the city of Hartford, under the laws of Connecticut. The defendants were an unincorporated association of persons engaged in the transportation of merchandise between New-York and Albany,

under the name of The Albany and Canal Line of Tow Boats. Thaddeus Joy and George Monteath transacted the business of the line at Albany, in the name of "Joy & Monteath, agents," &c. and Alfred Hoyt was the agent in New-York. Joy was also a director of the Canal Bank of Albany, and on the 30th of June, 1848, at the request of the cashier of that bank, and for the accommodation of the bank, he made three drafts upon the agent of the line in New-York, one dated on the 20th of June, at 90 days, for $3500, another dated the 22d of June, at 65 days, for $3000, and the other dated the 23d of June, at 75 days, for $3500. These drafts were signed "Joy & Monteath, agents, A. and Canal Line of Tow Boats," payable to their own order, and addressed to and accepted by "Alfred Hoyt, agent." They were also indorsed by Joy in the name of "Joy & Monteath, agents," and delivered to the cashier of the Canal Bank. These drafts were forwarded by the cashier, on the same day they were received, to the cashier of the plaintiffs' bank, to be discounted. They were indorsed "T. Olcott, cashier." On receiving the drafts the plaintiffs paid for them by a check upon a bank in New-York, payable to the order of the messenger by whom they had been sent, according to the instructions of the cashier of the Canal Bank. At the time the drafts were drawn they were entered on the pass-book of the Albany and Canal Line with the Canal Bank, and after that bank had received returns from the plaintiffs, and before its failure, the amount was carried out to the credit of the defendants, on the pass-book. This book was kept by Joy. Monteath, the other agent at Albany, had no knowledge of the transaction, until after the failure of the Canal Bank. That failure took place on the 11th day of July, 1848. Previous to that date, no entry had been made upon the books of the defendants, in respect to the drafts. This action was brought to recover the amount of these three drafts. It was tried at the Albany circuit in November, 1850, before Mr. Justice Wright.

It was admitted by the defendants, in their answer, that Joy & Monteath were authorized to transact the business of their line, and for that purpose were authorized to draw, indorse and accept such checks, drafts and bills of exchange as were neces-

sary for carrying on such business. It was also admitted, that all the business of the defendants at Albany was done in the name of Joy & Monteath, agents, &c. It was further admitted, that Alfred Hoyt had the like authority in respect to the business in New-York.

Upon the trial, after the testimony was closed, the judge, upon motion of the defendants' counsel, nonsuited the plaintiffs, and an exception to the decision was duly taken. Judgment having been perfected, the plaintiffs appealed to the general term.

*M. T. Reynolds*, for the plaintiffs.

*N. Hill, Jun.* for the defendants.

*By the Court*, HARRIS, J. Joy & Monteath were the general agents of the defendants for the transaction of their freighting business. Whatever that business required to be done, they were authorized to do. If their power had been written out, the instrument which recorded it would be found to contain authority to draw and indorse drafts, in all respects like those upon which this action is brought, provided, of course, they were drawn and indorsed for the purposes of their agency. Had the drafts in question been discounted, in good faith, for the benefit of the Albany and Canal Line, instead of the Canal Bank, no one would deny the authority of Joy to draw and indorse them. On the other hand, it is equally clear that, though the transaction might be, in form, within the terms of the agent's authority, if the plaintiff knew, when it discounted the drafts, that they were made for an object not within the scope of the agency, it could not recover against the defendants.

That Joy transcended his authority is not to be denied. But it was not in drawing or indorsing the drafts ; for this he was authorized to do. It was in applying the drafts, when made and indorsed, to a purpose not within his agency. The delivery of the drafts to the cashier of the Canal Bank, to be used for the benefit of that bank, and, in no way for the benefit of the defendants, was an unauthorized act. One or the other of the parties to this action must bear the loss resulting from this vio-

lation of duty.    The important question is, upon which it shall fall.

The plaintiffs, when the drafts were presented for discount, were apprised, by the form in which they were drawn, that Joy & Monteath assumed, in making the paper, to act as the agents of the defendants.    This was sufficient to put them upon inquiry, in respect to the authority under which the drafts were drawn. Had they, in the exercise of a reasonable prudence, made such inquiry, they would have learned that the agents had for many years, with the knowledge and acquiesence of their. principals, been accustomed to make and indorse drafts in all respects like those in question.    They would have discovered no defect of authority.    For the law will infer authority, as well from the general character of the acts which the agent has been permitted to do, as from a special written power.    "Usual employ," says. Chitty, "is evidence of authority."    (*Chitty on Bills*, ed. of . 1830, 25.)    "It is clear," said Lord Ellenborough, in *Pickering* v. *Bush*, (15 *East*, 38,) "that the agent may bind his principal within the limits of the authority with which he has been apparently clothed by the principal, in respect to the subject matter.    There would be no safety in mercantile transactions if he could not."    "As to the public," says Parsons, in his admirable work, just published, "the rule is, that the authority of a general agent may be regarded as measured by the usual extent of his general employment."    (1 *Parsons on Cont.* 41.)    Guided by this rule, it will not be questioned that the authority of Joy to make and indorse the drafts in question, was sufficiently comprehensive.

The next and more important question is, whether, having satisfied itself that the drafts were, upon their face, within the authority of the agents by whom they had been drawn, indorsed and accepted, it was bound to go further, and inquire whether they had not been misappropriated.    It is a general rule, that a party who takes a bill of exchange or promissory note, in the usual course of business, before maturity, and for a valuable consideration, has only to look to the genuineness of the signatures.    Even though it may have been stolen from the true

owner, if the bill or note has been indorsed in blank, or is payable to bearer, the party who takes it from the thief, in good faith, and for a full consideration, acquires a good title. If it be shown that the note or bill was fraudulent in its inception, or that the party negotiating it came wrongfully by it, then the burden of proof will be cast upon the party asserting title, to show that it came fairly into his possession; but, having shown himself to be a *bona fide* holder, he will be protected. These are familiar principles, and need no authority for their support.

But it is insisted on behalf of the defense, that, inasmuch as " the bills purported on their face to have been drawn by *procuration*, the plaintiff cannot claim the right of a *bona fide* holder, but is chargeable with knowledge of Joy's want of authority." I am not prepared to admit such an exception to the general doctrine applicable to negotiable paper. Nor do I think the authorities upon which the defendants' counsel relies, sustain his position.

In *Alexander* v. *Mackenzie*, (6 *Man.*, *Gr. & Scott*, 766,) one Gillan had made his draft for his own accommodation, and payable to his own order, and, having indorsed it, procured one Bleckley, the manager of The Newcastle-upon-Tyne Joint Stock Banking Company, to indorse it. The indorsement was as follows : " *Per proc.* Newcastle-upon-Tyne Joint Stock Banking Company, H. Bleckley, manager." The draft thus indorsed, having been negotiated by the drawer, came into the hands of the plaintiff. The action was brought against Mackenzie as the public officer of the banking company. There was evidence to show that Bleckley had authority to draw, accept and indorse on account of the banking company. For the plaintiff it was insisted, that, as a *bona fide* holder for value, he had nothing to do with any irregularity by Bleckley in the execution of his general authority. For the defendant it was insisted, that Bleckley's authority was to be exercised only for the benefit of his employers, and did not enable him, in their names, to give currency to accommodation bills. The judge before whom the case was tried, did what I think my learned brother should have done in this case ; he left it to the jury to say, whether Bleck-

ley had indorsed the draft by authority of the bank; telling them that if he had a general authority to draw, accept and indorse on account of the bank, "an innocent indorsee for value ought not to be prejudiced by any irregularity in his mode of exercising it." The verdict was for the defendant. Upon application for a new trial the decision was sustained, on the ground that Bleckley was acting under a special and limited authority. Coltman, J. said, "If this banking company had been in the habit of allowing their cashier, or manager, to indorse bills on their behalf, that would have imparted a general authority, and the public would not have been bound to inquire into the circumstances, or the precise extent of such authority." And Maule, J. said, "According to the evidence, every bill that was accepted or indorsed by Bleckley, was accepted or indorsed with an express intimation that the acceptance or indorsement was done under a special and limited authority. The case is, therefore, removed out of that class of cases where the extent of the authority is to be inferred from its exercise, and the mode of exercising it does not import any limitation of the authority."

In *Atwood* v. *Munnings*, (7 *Barn. & Cress.* 278,) the agent had acted under a written power of attorney, limited in its terms. The case turned upon the construction to be given to the terms in which the power was expressed. See *North River Bank* v. *Aymar*, (3 *Hill*, 262,) where the case is reviewed at length. So in *Beach* v. *Vandewater*, (1 *Sand.* 265,) the agent acted under a special limited power in writing. It was held that there was no evidence in the case, from which a general authority of the agent to accept drafts could be inferred.

But the case of *The North River Bank* v. *Aymar*, above cited, is directly in point, and, as authority, should, as it seems to me, be regarded as decisive of the question now under consideration. Pexcel Fowler had given to his brother Jacob D. Fowler a written power of attorney authorizing him to his use, and in his name, to draw and indorse notes, &c. The attorney had made the notes in question, and delivered them to the firm of D. Rogers & Son for the benefit of that firm. The notes were

The Exchange Bank *v.* Monteith.

received by the North River Bank in the ordinary course of business, and for a valuable consideration. They were signed "Pexcel Fowler—Jacob D. Fowler, attorney." The action was against the executors of Pexcel Fowler. Upon error to the superior court of New-York, it was held, that, though the power conferred upon the attorney was limited to notes, &c. in the proper business of the principal, yet, as the notes presented to and discounted by the bank purported to have been made in conformity with the power, the principal would not be allowed to insist that the attorney had exceeded his authority. Indeed, I think it was never yet held that a principal was not bound by the act of his agent, when such act was apparently within the scope of his authority, and the party with whom he dealt was not actually or constructively chargeable with knowledge that the agent was in fact transcending his authority. " If the authority *apparently* justifies the act," says Story, " it is no objection that the agent has secretly applied his authority to other purposes than those for which it was given." He proceeds to illustrate the principle by putting, as an example, the very case under consideration. " As if," he says, " having authority to make notes in the principal's name, in managing his business, the agent should make such notes for secret purposes of a different nature, which could not be known to other persons dealing with him." (*Story on Agency,* § 73.) Again, the same writer says, (§ 165,) " If a general discretion is reposed, the act of the agent, however indiscreet, becomes obligatory, unless, indeed, there is such gross misconduct as amounts to a fraud upon the principal, and that misconduct is known to the person contracting with the agent."

I am of opinion, therefore, that the case should have been submitted to the jury, with instructions that the plaintiff would be entitled to recover if Joy, by whom the drafts were made and indorsed, was the general agent of the defendants, and as such, was authorized to make and indorse notes and bills of exchange for the benefit of his principals, and the drafts so made and indorsed were received and discounted by the plaintiff in the ordinary course of business. There being no dispute,

The Exchange Bank *v.* Monteath.

as I understand the facts of the case, in respect to the authority of the agent to make and negotiate such drafts for the purposes of his employment, the only remaining question would be, whether the plaintiff received the drafts under such circumstances as entitle it to the protection which the law extends to the *bona fide* holder of commercial paper. The drafts were, confessedly, made and put into circulation in violation of the duty of the agent. This fact entitles the defendants, before they are made to answer for the fraud of their agent, to know how the plaintiff obtained them. If the evidence shall satisfy the jury that the plaintiff was in no way chargeable with knowledge of the circumstances under which the paper was made and delivered to Olcott, but that it was received in the ordinary course of the plaintiffs' business, in the belief that it was made for the legitimate purposes for which such paper might be made by the agent, there is no reason, either in law or equity, why the plaintiffs should be made to bear the loss. As between two innocent parties, thus situated, the defendants, rather than the plaintiffs, should suffer for their misplaced confidence.

I have not deemed it important to notice the questions which have been made in respect to the admission of improper evidence upon the trial. If, upon another trial, the testimony should be confined, as I suppose it ought to be, to the questions I have already indicated, the same objections will not be likely to arise.

The judgment should therefore be reversed, and a new trial ordered, with costs to abide the event.

WRIGHT, J., dissented.

[ALBANY GENERAL TERM, September 5, 1853.    *Watson, Wright* and *Harris,* Justices.]